IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROSA JUSINO, o/b/o<br>Jonathan Petrov, a minor,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | Case No: 07 C 2648<br><br>Magistrate Judge Jeffrey Cole |

## MEMORANDUM AND ORDER

The plaintiff, Rosa Jusino, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her minor son, Jonathan Petrov's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1383(c)(3). Ms. Jusino asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Jusino applied for SSI on behalf of her son, Jonathan, on November 24, 2004. (Administrative Record ("R.") 74-75). She claimed he had been disabled since birth (R. 74) due to hyperactivity, hearing and vision problems, a nervous condition, bad teeth, and behavioral issues. (R. 103). The application was denied initially and upon reconsideration. (R. 37-39, 53-62). Ms. Jusino continued pursuit of the claim by filing a timely request for hearing on October 5, 2005. (R. 51-52).

An administrative law judge ("ALJ") convened a hearing on September 12, 2005, at which Ms. Jusino and her son, represented by counsel, appeared and testified. (R. 325-72). On September 29, 2006, the ALJ issued a decision denying the application for SSI, because Jonathan did not have an impairment or combination of impairments that met or equaled the Listings. (R. 17-26). This became the final decision of the Commissioner when the Appeals Council denied Ms. Jusino's request for review of the decision on April 27, 2007. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Jusino has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Medical Evidence

On February 25, 2005 the Agency arranged for Jonathon to undergo a consultative examination with psychologist Norton Knopf. (R. 204.) Curiously, Dr. Knopf noted that the child was escorted to the exam by his biological mother, Ms. Jusino, but that his primary caretaker was his *adoptive* mother (R. 204) – whoever that is; there is no other mention of an adoptive mother in the record. Ms. Jusino revealed that her son had become increasingly hyperactive, that it was interfering with his school, and that this was the first time Jonathon had seen a healthcare professional in regards to it. (R. 204). At the time, she said Jonathon attended regular first grade classes full time at a public school. He did not take special education courses. (R. 205; 207). Ms. Jusino said he was rarely absent from school, even for excused reasons. (R. 207). She said he was able

to go to bed on his own, wash and bathe himself, tie his shoes, and get dressed by himself. (R. 207).

Dr. Knopf observed Jonathan's behavior to be "marked by fidgeting and restlessness." (R. 205). He appeared agitated. (R. 205). He was alert, but sometimes did not want to respond to questions. (R. 205). Speech was normal, in all respects. (R. 205). He appeared to be in a mild level of psychological distress and he paced. (R. 205). Jonathon's thought process was logical and coherent. (R. 206). Based on a "mini-evaluation," Dr. Knopf found Jonathan's attention and concentration skills normal, and estimated his intellectual ability "as being in the borderline to developmentally disabled range." (R. 206).

Jonathon said he was failing in school and had no desire to do better. (R. 207). There were indications of problems at school: he did not wait his turn, he was messy and disorganized, he forgot instructions, had to be told to remain still and quiet. (R. 207). Dr. Knopf concluded that Jonathan's personality was best characterized as "explosive," and his judgment poor. (R. 208). Jonathon did not exhibit cognitive distortions or significant errors in thinking. (R. 208). His abilities to delay gratification and tolerate frustration were fair. (R. 208). The doctor's "diagnostic impressions" were Attention-Deficit/ Hyperactivity Disorder, Combined type; Disruptive Behavior disorder. (R. 208).

On March 1, 2005 Dr. Virgilio Pilapil, M.D., reviewed the record for the Agency. (R 210). He felt that Jonathan's ADHD was severe but did not meet, equal, or functionally equal a listed impairment. (R. 210). He found a less than marked limitation in "acquiring and using information," stating that while Jonathon was failing most subjects due to an inability to concentrate and focus, he was not in special education, and

3

could acquire new information but could not sit still long enough to apply it. (R 212). He suffered a marked limitation in "attending and completing tasks," stating that he had great difficulty working, staying focused, and completing tasks; was unorganized; disruptive to self and others; fidgety and restless; and sometimes oppositional. (R. 212). He found a less than marked limitation in "interacting and relating to others," noting that Jonathan had one good friend, but had trouble with peers due to fighting. (R. 212). Dr. Pilapil thought Jonathon had no limitation in "caring for self. " (R. 213).

Ms. Jusino went to Hartgrove Hospital with her son on March 24, 2005. (R. 290). At the time, she said Jonathon had never been prescribed psychiatric medications. (R. 290). He was observed to be hyperactive and oppositional at the session. (R. 291-92). He was prescribed Adderall. (R. 292).

On July 26, 2005, Ms. Jusino took her son for psychological evaluation to Children's Memorial Hospital. Ms. Jusino reported that Jonathon was then taking Methylphenidate and Adderall. (R. 258).[1] At the time, the attending physician, M. Johnson, noted that Jonathon had been receiving treatment and medication for *two years* (R. 263, 274) – contrary to what Ms. Jusino had told Dr. Knopf and the attending physician at Hartgrove a few months earlier in February. Ms. Jusino also changed her previous report regarding the types of classes Jonathon took, saying he had been enrolled in special education classes since 2004. (R. 261). He generally got "Fs" for grades, but had not been held back. (R. 261). Dr. Johnson noted that Jonathan had abnormal (extremely active) psychomotor activity; an awkward gait and a slow walk. (R. 278); abnormal attention and impulse control; and poor judgment and insight. (R. 279). The

---

[1] It would appear that Jonathon was started on Ritalin (or Methylphenidate) at Hartgrove on June 28, 2005. (R. 294).

4

remainder of the exam, including intelligence, speech, use of language, fine motor coordination, affect, and mood were all average or normal. (R. 278-79). The doctor's diagnoses included ADHD/ Hyperactivity Disorder, , oppositional defiance disorder, and reading and math disorder. (R. 282). He assigned a Global Assessment of Functioning ("GAF") Score of 40. (R. 284).[2]

Ms. Jusino and Jonathon then attended regular followup medical and counseling sessions at Children's Hospital. On August 24, 2005, Ms. Jusino reported that Jonathon was calm and doing well on his new medication, Metadate, but that the effects wore off after about four hours. (R. 252). The plan was to increase the dosage. (R. 251). Jonathon said he felt good, and he was calm and compliant at the session. (R. 251-52). A month later, Ms. Jusino revealed that she had only just begun giving Jonathon his new dosage, so no assessment of its effects could be made. (R. 250). Nevertheless, Jonathon was calm, pleasant and cooperative at the session. (R. 249). His attention had improved and his hyperactivity had diminished. (R. 249).[3]

By October 19th, Jonathon's teachers were reporting that he was inattentive in the mornings, but improved in the afternoons after his lunchtime medication. (R. 248). He continued to do "miserably in terms of academics," however, and was simply unable to do the homework assigned. (R. 248). At examination that day, he was relaxed, calm and

---

[2] The Global Assessment of Functioning or "GAF" assigns a numerical score scale to a "clinician's assessment of the individual's overall level of functioning." *Sims v. Barnhart*, 309 F.3d 424, 427 (7th Cir. 2002)(*quoting* American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 30 (4th ed. 1994)). A score of 31-40 indicates "some impairment in reality testing or communication ( e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., . . . child frequently beats up younger children, is defiant at home, and is failing at school ).

[3] In September 2005, Dr. Vidya Madala performed another record review for the Agency, and reached essentially the same conclusions as Dr. Pilapil. (R. 216-18.)

5

cooperative. (R. 247). On November 16, 2005, it was reported that Jonathon's attention continued to improve. (R 246). He seemed too subdued at examination, however, so his dosage was adjusted. (R. 246). In December, Jonathon was making progress in school, and responding well to special education. (R. 244). But he also needed glasses, which was not surprisingly having an adverse effect on his schooling. (R. 244).

Jonathon missed his January 2006 appointment (R. 242), but in February it was reported that his attention continued to improve and he was "[d]oing fine in school." (R. 240-41). His mother said she was stressed from working too much. (R.241). She had not had time to take him for glasses. (R. 241). Jonathon missed his March appointment as he was vacationing with his mother, visiting family in New England. (R. 239). When he and his mother returned for their April appointment, Ms. Jusino reported that Jonathon had been out of medication for a while. It was explained to her that she just had to called and it would be mailed to her. (R. 239). Even off medication he was active but not out of control. (R. 239). He continued to do much better in school, although his mother had not yet taken him for glasses. (R. 239).[4]

On June 14, 2006, Jonathon was reported to be doing fairly well in school, and making especially good progress in reading. (R. 237). He would get sick when he took his medication on an empty stomach in the morning, and his mother was in the habit of sending him to school without breakfast. (R. 237). The attending had to encourage Jonathon's mother to give him some breakfast regularly – for a number of reasons. (R. 237). The plan was to leave Jonathon off medication while school was out for summer. (R. 237). In August, it was reported that Jonathon was extremely hyperactive without

---

[4] According to school records, Jonathon did not get glasses until January 8, 2007. (R. 305).

medication, and was started on Focalin. (R. 235). Ms. Jusino was again encouraged to feed her son breakfast consistently. (R. 235). She had had what sounded like a "TIA" (transient ischemic attack or mini-stroke, http://www.emedicinehealth.com/ transient_ischemic_attack_mini-stroke/article_em.htm), and quit her job because of stress. (R. 235).

B.
School Evidence

During the 2004-05 school year – first grade – Jonathan received "Fs," in reading, writing, listening, and social science; "Ds" in math and science, "Cs" in health and safety and learning technology, "Bs" in speaking, art, and music, and an "A" in physical education. (R. 124). Incredibly, he had missed 30 days of school – or six weeks of a thirty-five-week school year. (R. 124). For the 2005-06 school year – second grade – he received "Fs," in writing and speaking, "Ds," in math, science, and social science, "Cs" in reading, music, and health and safety, and "Bs" in art and physical education. (R 124). He missed 20 days of school that year. (R. 124).

On September 21, 2005 – toward the beginning of second grade – Jonathon's teacher reported he was two or more years below grade level in reading, writing, spelling, and arithmetic. (R. 131). The teacher completed a form describing his behavior as follows: "very often": difficulty paying attention to tasks or play activities; difficulty following through on instruction and fails to finish things; difficulty organizing tasks and activities; avoids doing tasks that require a lot of mental effort; loses things necessary for activities; easily distracted by other things going on; forgetful in daily activities; fidgets with hands or feet or squirms in seat; difficulty remaining seated when asked to do so; is "on the go" as if "driven by a motor; "talks excessively. (R. 131-32). Jonathon "never":

7

lost his temper; argued with adults; refused to do what he was told; lied; started fights; acted restless or edgy; was irritable and unable to relax; did not play well with other children; had a problem with language development. (R. 131-34). His teacher noted that medication seemed to keep Jonathan partially focused, and that the amount of work he was required to do was modified. (R 134).

In January 2005, Jonathan's teacher completed an evaluation form in which she indicated that the following statements about Jonathon were "Very Much True": restless in the "squirmy" sense; forgets things he has already learned; temper outbursts, explosive unpredictable behavior; excitable, impulsive; always "on the go" as if "driven by a motor"; one of the last to be picked for teams or games; restless or overactive; fails to finish things he starts; does not seem to listen to what is being said to him; actively defies or refuses to comply with adults requests; leaves seat in classroom when expected to be seated; poor in spelling; inattentive, easily distracted; difficulty organizing tasks or activities; difficulty sustaining attention in tasks or play activities; not reading up to par; fidgeting; disturbs other children; talks excessively; cannot remain still; difficulty playing in leisure activities quietly; fidgets with hands or feet and squirms in seat; short attention span; loses things necessary for tasks; interrupts or intrudes on others; poor in arithmetic; does not follow through on instructions, fails to finish school work (due to failure to understand instructions). (R. 191). She gave Jonathon a 9 on a nine-point scale in the "inattentive symptoms" category, and a 7 in the hyperactive-impulsive category. (R. 194).

In January of 2007 – the middle third grade – Jonathon underwent an educational assessment that included the Kaufman Educational Achievement test. With 100

8

representing the median performance, Jonathon scored 97 in letter and word recognition, 100 in reading comprehension, 76 in math concepts and application, 84 in math computation, 98 in spelling, and 75 in written expression. (R. 305; *see* http://ags.pearsonassessments.com/). He demonstrated an "overall ability in the average range, with visual processing skills stronger than verbal ability." (R. 306). He was described as very active and impulsive, although these problems had improved. (R. 306). There was concern with hyperactivity, inattention, and aggression, "although . . . Jonathon's behaviors are less significant in school than at home." (R. 306).

There are also reports on Jonathon from his school nurse, regarding his eating habits, behavior, and course of medication. Jonathon was suspended briefly in March of 2005, for bring a kitchen knife to school and showing it to another student. (R. 140, Beyond that, the nurse's reports include concerns similar to those voiced by the staff at Children's Hospital. On March 28, 2005, Ms. Jusino informed Jonathon's school nurse that he had to take medication during the day at school – but she did not remember the name of the medication or the dosage. (R. 125, 140-41). The nurse had to contact Hartgrove Hospital to get the necessary information about the child's medication. (R. 140). There were times when Jonathon had to be taken to the nurse's office for breakfast so he could take his medication. (R. 139, 160, 162, 164). When his mother sent lunch from home, Jonathon's meal might consist of nachos (R. 154), or potato chips, mini-muffin, and Mountain Dew (R. 144-45), or a pack of oreos and a twinkie (R. 143), or oreos and a pretzel. (R. 142). Elsewhere, on a form sent home by the school, Ms. Jusino indicated that she did not read to Jonathon despite the school's recommendations. (R. 121).

## C.
## Administrative Hearing Testimony

### 1.
### Mother's Testimony

At the September 2006 hearing, Ms. Jusino testified that Jonathon had just begun 3rd grade, but at the same time, she said she was unclear as to whether he had been promoted. (R. 331). She did not "really know if they changed him or didn't. I have to go back to the school to see what's going on." (R. 331). Ms. Jusino thought he had the same teacher as the previous year, but did not know her name. (R. 332). She said Jonathon was in regular classes but got special instruction in reading and math. (R. 331-32). She had not brought his report card to the hearing, but said that his grades were improving a little. (R. 333).

Ms. Jusino thought that Jonathon's present medication was working better. (R. 334). The prescription is for five milligrams of Focalin after food in the morning. (R. 336). Even so, most mornings she did not give him any because he told her he had a stomach ache. (R. 335). She seemed to realize that this was perhaps due to her failing to feed him breakfast, and she claimed she was doing that now. (R. 335). When she did this – followed her son's doctor's instructions – she noticed improvement. (R. 336). At the time of the hearing, Jonathon had only been on his new medication regimen for barely two weeks. (R. 338). Not surprisingly, he was "[r]eal hyper" all summer while he was off his medication. (R. 339). He could not sit still and concentrate for more than twenty minutes. (R. 340). Ms. Jusino related that Jonathon no longer wanted to eat the lunches at school, and she had to prepare a lunch for him every day. (R. 358).

10

Ms. Jusino said that her son got along with friends at school and in the neighborhood. (R. 341). She said he was clumsy though – he fell often when riding his bike. (R. 342). Their doctor suggested she have her son wear a helmet when riding. (R. 342). She also said that she did not allow Jonathon's friends to come over because he would give away his toys. (R. 351-52). He needed some help getting dressed, and mimicked the way other people wore their clothes. (R. 343). He was able to shower but would sometimes forget to wash his hair. (R. 343). He puts his things away when he is through with them. (R. 352). He is able to count change, but forgets to take it when he has purchased something. (R. 360). He does his homework every night, with the help of Ms. Jusino's sister. (R. 344). Her sister took Jonathon to the movies during the summer, but Ms. Jusino never asked whether he managed to sit through the films. (R. 340). Ms. Jusino thought her son was too hyperactive to play organized sports, so she has never bothered to look into signing him up. (R. 341).

## III.
## THE ALJ'S DECISION

The ALJ stated that Jonathan, born on June 21, 1998, was a school-aged child on the date of his SSI application, and on the date of her decision. (R. 20). She found that he suffered from the following severe impairments: attention deficit hyperactivity disorder ("ADHD"), asthma, and reading and mathematics disorders which were possibly indicative of a learning disability. The ALJ noted that the record contained references to disruptive behavior disorder, explosive personality, and oppositional defiant disorder, but found that finding that Jonathan's treating psychiatrist and school personnel cited ADHD as the primary threat to his academic and personal development. (R. 20).

The ALJ concluded that Jonathan's impairments did not meet or equal the requirements of any listed impairment, stating:

> As regards section 112.11 of Appendix 1 [ADHD], while claimant does manifest hyperactivity, inattention and impulsivity, particularly when he has not taken his medication, the severity of any functional limitations arising from this or his learning difficulties, does not satisfy the criteria at section 112.02B.2. Additionally, claimant's asthma is controlled with an inhaler which he uses only as needed; primarily in cold weather.

focusing on Listing 112.11 for ADHD. (R. 20). She determined that there was no functional equivalence to a listed impairment, specifically finding that Jonathan had a less than marked limitation in "acquiring and using information" (R. 21-22); a marked, but not extreme, limitation in "attending and completing tasks" (R 22-23); less than marked limitation in "interacting and relating with others" (R 23-24); no limitation in "caring for self" (R 25); and a less than marked limitation in "health and physical well being." (R 25-26).

The ALJ found the "statements concerning the intensity, persistence and limiting effects of the claimant's symptoms not entirely credible." (R. 21). She noted that Jonathan's mother sometimes kept him home from school when he was not ill, the psychiatrist's records show that generally Jonathan was calm, pleasant, cooperative and compliant when he was given his medication properly, and that Jonathan began to progress academically when his medication regime was followed and he was given special education resources. (R. 21). The ALJ assigned "controlling weight" to the state agency medical consultants' opinions. She said their assessments were "reasonable"in light of Jonathan's steady improvement when his mother paid attention to his medication regimen and proper nutrition. (R. 21).

# IV.
# DISCUSSION

## A.
## Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need

13

not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

## B.
## Sequential Analysis

A child is disabled under the Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486-87 (7th Cir.2007). At the outset, if the child is engaging in substantial gainful activity, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 486. Next, if he does not have a medically severe impairment or combination of impairments, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 486. Finally, the child's claim will be denied unless his impairment meets, or is medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate

14

standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds he has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

### C.

The record of parental omissions in this case is disturbing. While medication appears to help Jonathan perform better both in and out of school, his mother is not always compliant with the regimen. Refills are often not ordered or picked up even though all that is required is a phone call to order and to arrange to have them sent to her. She does not always give accurate information about Jonathon's medication, either to health care providers or school personnel. Although Jonathan cannot take his medicine

on an empty stomach because it makes him sick, his mother does not take the simple – and physician-recommended – step of giving her child a little breakfast before school. Nor does she bother even to prepare a lunch with any nutritional value. Sending him on to school with oreos, twinkies, and pretzels suffices for her.

She does not find the time to take her son for glasses, although he needs them. Her testimony revealed a lack of awareness of what grade Jonathan is in. She says he rarely misses class, but in fact he misses class a great deal – far more frequently than he should, given the academic challenges he faces. She takes him out of school for extended periods. In short, Ms. Jusino's acts and omissions exacerbate her son's condition. If her conduct goes before the court for review, the decision would be easy. But it is the ALJ's decision and not the choices that she makes with which we must deal.

Ms. Jusino finds several flaws in that decision but, first and foremost, she argues that the ALJ failed to adequately explain why Jonathon's impairments do not meet or equal a listed impairment. As already noted, an ALJ must explain the reasoning behind her conclusions, or there can be no meaningful review. *Berger*, 516 F.3d at 544; *Scott*, 297 F.3d at 595. Here, the ALJ found that Jonathon did not meet listing 112.11 for ADHD because he did not exhibit any of the criteria required by section "B" of that listing – the listing is met when a claimant demonstrates both section "A" and section "B" criteria.[5] She concluded that section "A" – requiring marked inattention, marked impulsiveness, and marked hyperactivity – was satisfied, but that section "B" was not.

---

[5] Section "B" refers to the criteria of another listing, listing 112.02 (Organic Mental Disorders), as the ALJ indicated. And *that* section requires a marked impairment in two of the following: cognitive/communicative functioning, age-appropriate social functioning, age-appropriate personal functioning, and difficulties maintaining concentration, persistence, and pace. 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 112.02(B)(2).

16

But that is *all* the ALJ said about section "B." Her conclusion was unsupported by any discussion or analysis; she provided no "logical bridge." *Dixon*, 270 F.3d at 1176; *Giles*, 483 F.3d at 486.

The Commissioner concedes that the ALJ did not articulate her analysis of the section "B" criteria. (*Defendant's Response to Plaintiff's Motion*, at 8). But, the Commissioner submits that the ALJ did discuss, at length, Jonathon's ability to acquire and use information; focus and maintain attention, and complete tasks; interact and relate with others; and care for himself. These are "domains" to be considered when determining whether an impairment is the "functional equivalent" of a listed impairment. The Commissioner argues that the ALJ's consideration of the "domains" can serve as her consideration of the "B" criteria. After all, the argument goes:

> A review reflects that these six domains of functioning contemplate the same sort of considerations described in the criteria of Section 112.02(B)(2) and discussed in 1 1 2.00(C)(3). For instance, the criteria of "concentration, persistence, or pace" described in Section 112.02(B)(2)(d) closely resembles the functional domain of "Attending and Completing Tasks." The criteria of "personal functioning" in Section 112.02(B)(2)(c) describes the same degree of self-care contemplated in the functional domain of "Caring for Yourself." Additionally, the criteria of "social functioning" described in Section 112.02(B)(2)(b) and (C)(3) relates to the same level of functioning discussed in the functional domain of "Interacting and Relating with Others." Lastly, the criteria of "cognitive function" described in Sections 1 1 2.02(B)(2)(a) and (C)(3) contemplates a level of cognitive ability seen in the functional domain of "Acquiring and Using Information." As such, any analysis of the criteria in Section 112.02(B)(2) would have been remarkably similar to the ALJ's analysis of the evidence of record as it related to the six domains of functioning.

(*Defendant's Response to Plaintiff's Motion*, at 8-9). The Commissioner has no support for his position, although it may seem to make sense at first blush because the domains do appear to be somewhat similar to the section "B" criteria. There is good authority,

17

however, that the "domains" and the section "B" requirements are not so similar that an ALJ need not discuss both, and that authority comes from the Agency itself.

Effective January 2, 2001, the Agency changed the rules for evaluating functional equivalency. Social Security Ruling 05-3p, 2005 WL 1041037, *2. Formerly, the functional equivalence analysis was linked to the listed impairments. That changed with the new rules, effective January 2, 2001. As the Agency explained:

> a frequent criticism of the broad areas of functioning was that they were "the same" as the domains in the childhood mental disorders listings because they used the same names. Although this criticism was inaccurate, it is true that the names of the domains in the interim final rules confused many people. *The new domains are specifically designed for determining functional equivalence and are completely delinked from the mental disorders and other listings.*

Final Rules, Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed.Reg. 54747, 54755 (Sept. 11, 2000)(emphasis supplied). So, contrary to the position in the Commissioner's brief, the two analyses are not redundant. They are, in the Agency's own terms, "delinked." The Agency says that characterizing the domains and the listing criteria as the same is "inaccurate" – and that is just what the Commissioner attempts to do here.

The ALJ cannot substitute a listings analysis for a functional equivalency analysis or vice versa. *Smith ex rel E.S.D. v. Barnhart*, 157 Fed.Appx. 57, 65, 2005 WL 3278037, *7 (10th Cir. 2005)(unpublished)(discussion of the functional equivalence domains does not serve as a substitute for the requisite analysis of the functional areas in the listings). As such, the ALJ failed to articulate her analysis of whether Jonathon's condition meets the section "B" criteria. This flaw necessitates a remand. The Seventh Circuit has not hesitated to remand an ALJ's decision that does not sufficiently articulate the basis for the

denial of benefits. *Giles*, 483 F.3d at 487; *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). On remand, the ALJ must provide an analysis of not just the "domains" relevant to functional equivalence, but of the criteria of the listings as well.

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 10/6/08